ROSE AND CROWN, LTD. ET AL. *v.* SHAW ENTERPRISES, INC.

[No. 130, September Term, 1975.]

*Decided November 5, 1975.*

The cause was argued before Morton, Davidson and Lowe, JJ.

*Roger W. Titus* for appellants.

*Jules Fink* for appellee.

Lowe, J., delivered the opinion of the Court.

By judgment concluding a lengthy and detailed opinion by Judge John F. McAuliffe, in the Circuit Court for Montgomery County, the commercial tenant operating the Rose and Crown Restaurant suffered forfeiture of its lease to the landlord, Shaw Enterprises, Inc. Although the substantial evidence and numerous issues in the case warranted the length of the opinion, we are faced with only two of the problems that confronted the lower court. To the extent possible we will limit the facts to accord these issues.

For our purposes it will suffice to note that appellee demised to appellants premises for the operation of a restaurant which included the sharing of parking facilities with appellee's motel customers. The ten year lease called for rental in an amount equal to 7% of appellants' monthly gross with a minimum guaranteed rental of $1,250.00, increasing to $1,666.67 after 5 years. To ascertain the 7%, appellants were to deliver to appellee a statement of all gross receipts during the preceding month together with the percentage due. Biannually, on the 15th day of June and

December,[1] a statement of gross receipts was required for the preceding six months,

> ". . . verified by a certified public accountant in good standing together with payment of any additional percentage rental found to be due for such period. . . .
>
> If the Landlord is not satisfied with any such monthly or semi-annual statement, it shall give the Tenant written notice of such dissatisfaction within thirty (30) days after receipt of such statement. . . ."

Appellants concede that the biannual statements due in 1971 and June 15, 1972 were not submitted as agreed. Nor was the percentage rental paid for the months of April, May and June of 1972 in excess of the minimum amount guarantee. Appellants contend that such rental was withheld because appellee had preempted half of the available parking area for temporary storage.

On August 8, 1972 appellee wrote appellants asserting their breach of the lease, citing the aforesaid failures among others. Appellants responded indicating a willingness to negotiate their potential business loss due to deprived parking against the withheld percentage rental. If silence by appellee did not convey its declination to negotiate, the suit that followed on August 28, 1972 surely did.

Appellants continued to tender future rental which appellee continued to accept, designating the sums so accepted as mesne profits which it referred to as "quantum meruit damages" in a letter dated October 31, 1972:

> "As I have previously informed you, any amounts of monies accepted by Mr. Shaw for rent due prior to the suit was and is accepted on the basis of arrearages due in the rent. Any sums accepted after August 18th, 1972, was accepted on the basis

1. Originally the lease required that the statements be submitted on the 15th day of May and November. The dates were changed by an agreement dated December 21, 1968.

of quantum meruit damages for the tenant's continued breach of the Lease."

Appellee continued to accept the rental payments during the period awaiting trial. "Additional rental," called for by the lease, of a percentage of increased real estate taxes was even demanded, and presumably received.

The case was tried in July of 1974 before Judge McAuliffe whose well articulated opinion contains numerous findings of fact, by which we are bound unless we find them to be clearly erroneous. Md. Rule 1086. We will also attempt to restrict our recitation of his findings to those relevant to the questions raised. After detailing the many grievances and disagreements leading to the present litigation he found among other things:

1. "Specifically, the tenant has failed or refused to pay all of the rent when and as the same came due, and has failed and refused to provide all the reports required of it by the third numbered paragraph of the lease agreement." [2]

2. Judicially noting an inevitable delay between suit and trial as in excess of a year, the court found that appellants were not misled by the continued acceptance of rent for "its continued occupancy was a valuable right, even if it had breached the lease and thereby forfeited the lease, and it was not therefore unreasonable for the tenant to continue to make payments in an amount which both parties had agreed was fair and reasonable for the occupancy of the premises."

3. ". . . that the failure on the part of the tenant to provide the financial reports required by the lease was persistent, calculated, deliberate, wilful, in violation of the fundamental principles

---

**2.** The court acknowledged appellants' reasons for withholding the rental, *i.e.,* the usurped parking area, but explained that this did not justify withholding the rental due under the agreement. Gratuitously, the court set forth several alternative remedies appellants had available.

of fair dealing, and did in fact amount to bad faith." [3]

4. ". . . that original records of transactions of the Rose and Crown Restaurant taken from the cash register and/or the precheck machine, were intentionally destroyed to cover falsification of the records as to gross receipts."

5. ". . . the original reluctance, and ultimate refusal of the Defendants to provide the statement required by the lease cannot be excused as mere negligence, or even gross negligence, but as indicated above, was clearly wilfull, deliberate and an act of bad faith."

The judge then decided that:

"Accordingly, the breach is such as will support the forfeiture of the lease and the relief sought, namely possession of the premises, and equitable relief to the defendant is not indicated."

The appeal is limited here to two contentions, waiver by the landlord and entitlement to equitable relief from forfeiture by the tenant.

### Waiver

The letter of August 8, 1972 clearly apprised appellants of appellee's intention to forfeit the lease. The letter said in part:

"Our patience, however, can endure no longer and we can no longer accede to your requests for further time. We must therefore furnish you the ten day notice provided by Paragraph 15 [4] of the

---

3. The evidentiary findings included lengthy, periodic withholding of funds unaccounted for by tenant, burning of cash register records, no audits by certified public accountants, and manipulated records "to reflect less gross income than was actually being received." Our review of the records accords that there was sufficient evidence for such findings.

4.

"(15) *FAILURE TO PAY:* If Tenant shall fail to pay said rent as aforesaid, or break or violate any of the within covenants,

Lease, and this letter shall be regarded as such notice. During this time, you are hereby notified to correct the following deficiencies: . . . ."

There followed two pages of "deficiencies", in considerable detail, including the failure to pay the percentage rent for April, May and June of 1972, the failure to furnish monthly statements for the months of December, 1971 through June, 1972 and the failure to furnish the six month statements verified by a certified public accountant for the period ending May 31, 1970, November 31, 1970, May 31, 1971, November 31, 1971 [5] and May 31, 1972.

Citing *Baltimore Butchers Abattoir & Live Stock Co., Inc. v. Union Rendering Co.,* 179 Md. 117 and *Frederick Motor Sales, Inc. v. Baltimore and Ohio Railroad Company,* 202 Md. 491, appellants begin with the general premise that since forfeitures for breaches of covenants are not favored, any slight acquiescence in a breach will be construed as a waiver of the forfeiture. They narrow this by contending that because appellee accepted rental payments for the two months immediately preceding the forfeiture notice and continuously since then, he has waived the forfeiture.

conditions, or agreements, and if such breach be not corrected (or if correction takes more than ten (10) days if action to correct be not begun and carried on with due diligence) within ten (10) days after written notice by Landlord to Tenant of such breach then and in any of the said events, this lease and all things herein contained shall, at Landlord's option, cease and determine and shall operate as a Notice to Quit, any other written Notice to Quit being hereby expressly waived. Landlord may proceed to recover possession of said premises under and by virtue of such legal process as may at the time be in operation. When such possession is obtained, Landlord may re-rent the demised premises at Tenant's risk and cost. Its defaults in no instance shall relieve Tenant of liability for the difference between the rent herein reserved and the net rent actually received by Landlord during the term remaining after such default occurs but Landlord agrees to use its best efforts to mitigate damages by re-letting the premises. If, in the event of such default Landlord elects not to lease the demised premises or elects to lease to a related party, no damages shall be payable to Landlord in respect of such period. Tenant shall pay a reasonable fee for an attorney engaged by Landlord to protect its rights in regaining possession of the demised premises in the event of such default."

5. Obviously the appellee meant November 30.

Appellants furthermore contend that the October 31, 1972 letter designating the payments as "quantum meruit" can not affect the waiver by acceptance. Appellants rely most heavily on text authority for that premise, stating that:

"Where the landlord, with knowledge or notice of an alleged breach accepts rent from his tenant, he waives his right to a forfeiture on such grounds, 49 Am. Jur. 2d, *Landlord and Tenant*, Section 1067, unless, for example, the lease contains an anti-waiver provision. . . ."

Had appellants completed the expression of the law as it appears in 49 Am.Jur.2d, Sec. 1067, they would have found that it was followed by the qualifying phrase,

". . . unless there are circumstances arising from such acceptance of rent by him so as to negative the presumption of his affirmance of the continuance of the lease."

In addition, we do not agree with what is recited as an absolute in appellants' interpretation of the law espoused by the Court of Appeals:

". . . and the rule that waiver of forfeiture occurs by acceptance of rent which became due after a breach committed by the tenant is fully applicable as enunciated by the Court of Appeals in *Morrison vs. Smith*, 90 Md. 76, 44 A. 1031 (1899). See also, *Ammendale Normal Institute, Inc. vs. Schrom Construction, Inc.*, 264 Md. 617, 288 A. 2d 140 (1972). Acceptance of rent under such circumstances is a clear waiver of the right to declare a forfeiture, and runs directly counter to the binding nature of the election which must be made by a landlord having knowledge of an alleged breach."

Under appellants' interpretation of the law, when ejectment of the tenant from the premises awaits a court determination, they would be permitted to stay on the

premises and the landlord would be compelled to foreswear payment therefore at the risk of waiving his right of forfeiture. We do not so strictly construe it.[6]

*Morrison* primarily holds that when a lease is liable to forfeiture for non-payment of rent when due, the subsequent receipt *of that rent* is *not* in itself a waiver of the forfeiture. What appellant refers to as "the rule" in *Morrison* was a qualification to a basic rule of non-waiver by acceptance of rent gleaned from even more ancient authority than itself.

> " 'The receipt of rent after a breach of covenant does not operate as a waiver unless the rent received accrued subsequently to the act which works the forfeiture.' *Bleeker v. Smith,* 13 Wend. 530; *Williams v. Vanderbilt,* 21 L. R. A. 489; 12 *Am. and Eng. Ency. of Law* (1st ed.) 758 n. 'The ordinary *waiver of forfeiture* occurs by an acceptance of rent *which became due after a breach committed by the tenant.'* Section 497, *Taylor's Landlord and Tenant* (7th ed.) This seems to be the well recognized rule of law on the subject settled by the great weight of authorities, if not by all." *Morrison v. Smith,* 90 Md. at 83.

The message of *Morrison* in regard to the acceptance of rent accruing *after* a breach is that such acceptance by the landlord is *evidence* of waiver of such strength, that standing alone, it would suffice as proof of waiver of forfeiture. It is, in short, a presumption. That presumption, as with any disputable one, is only viable in the absence of certainty, or until certainty or evidence of greater persuasion than that having given rise to the presumption, can be ascertained.

In *Streeter v. Middlemas,* 240 Md. 169, the question of waiver by subsequent acceptance of rent was an issue.

---

**6.** We have reviewed the out-of-state authorities cited to us by appellants, but find ample apposite case law within Maryland to decide this case.

Although in that case the lease had a non-waiver by acceptance clause, the Court did not decide the question on the language of the lease. The Court's emphasis was placed upon whether or not the tenant was misled by the acceptance:

> "In any event the landlords' actions clearly established a no waiver policy. They twice were forced to institute suits to collect back taxes, and in July of 1962 brought suit in the People's Court of Montgomery County to recover possession of the premises. Even after this suit was terminated because of the lack of jurisdiction of the People's Court, the breach of the covenant to pay rent when due continued. *It is clear that the tenants were not misled as to the landlords' determination to enforce their rights under the lease. Thus the former breaches were not waived* and could properly be given consideration by the trial judge when deciding whether it was appropriate to grant equitable relief to prevent the forfeiture of the lease." [Emphasis added]. *Streeter v. Middlemas*, 240 Md. at 175.

While the qualifying rule of *Morrison* is the expression of a natural presumption based upon a common sense conclusion when standing alone, *Streeter* points up how illogical it becomes when evidence is at hand to indicate a clearly expressed, and obviously understood, intention to the contrary as in the case at bar. Appellee's precipitous suit following its August 8, 1972 letter clearly indicated its intention to terminate the lease. To assure that appellants be not misled, it again spelled out that its acceptance of subsequent rental, *i.e.*, due after the expiration of the 10 day notice "was accepted on a 'quantum meruit' " basis. Whether appellee meant by that phrase "mesne profits" as suggested in appellants' brief is not significant. However interpreted, it was clearly intended as an assurance that acceptance of rental did not indicate intention to waive the forfeiture. We agree with the conclusion of the trial judge from the facts as he found them; appellants were not misled and appellee did

not waive the forfeiture by accepting payments for appellants' holding over pending litigation.

A holding to the contrary would of necessity require us first to ignore the facts as found by the trial judge and secondly to ignore entirely the failure on the part of appellants to provide the financial reports required by the lease, none of which have ever been produced, and without which the rent due cannot be determined. Finally, we would have to hold that *Morrison* expressed a rigid rule of law rather than a presumption given rise to by proof of specific facts and subject to refutation by proof to the contrary.

## Equitable Relief from Forfeiture

Recognizing that the purpose for the condition requiring financial statements was to determine the amount of rent, we are faced with the principle of relief from forfeiture upon equitable grounds stated in *Wylie v. Kirby*, 115 Md. 282, 286-287:

> "It is an established doctrine that equity will grant relief from a forfeiture, where such a condition is provided to secure the payment of money, as in the case of right of re-entry for the non-payment of rent at the time designated in the lease. *Carpenter v. Wilson*, 100 Md. 22; *City Bank of Baltimore v. Smith*, 3 G. & J. 280; *Story's Equity Jur.*, 13th ed., secs. 1314 to 1316. In his discussion of the subject JUSTICE STORY observes: 'In reason, in conscience, in natural equity, there is no ground to say because a man has stipulated for a penalty in case of his omission to do a particular act (the real object of the parties being the performance of the act), that if he omits to do the act he shall suffer an enormous loss wholly disproportionate to the injury to the other party.' "

That principle, like the waiver doctrine, is an offshoot of the disfavor with which the courts will view a forfeiture. It seems little more than an application of the rules of fair play to landlords and tenants. In accord with that concept,

however, is the proviso expressed in *Wylie v. Kirby, supra,* 115 Md. at 287, this time quoting 2 *Taylor on Landlord and Tenant,* Sec. 496, providing a circumstance when equity will not intervene:

> " 'But Courts of equity are only closed against the tenant where the forfeiture is incurred by his wilful and culpable neglect to fulfill the terms of his covenant and not in cases where the omission has been occasioned by inevitable accident. And the general rule to be applied to all such cases seems to be that Courts of equity will relieve where the omission and subsequent forfeiture are the result of mistake or accident and the injury and inconvenience arising from it are capable of compensation; *but where the transaction is wilful, or the compensation impracticable, they invariably refuse to interfere.'* " [Emphasis added].

It is apparent that the case at bar fits the exception, not the rule. Certainly when Judge McAuliffe found that the cash register tapes had been intentionally burned and records manipulated, the real rent due could never be determined. Consequently, the "wilfull" acts created a situation where the determination of the "compensation" becomes "impracticable." Equitable relief becomes unavailable under both *Wylie* exceptions.

The most recent discussion of the equitable relief against forfeiture doctrine states an even more conclusive reason for denying such relief, *i.e.,* where the tenant has violated fundamental principles of fair dealing. Judge Singley, writing for the Court of Appeals in *Dreisonstok v. Dworman Bldg. Corp.,* 264 Md. 50, 59, said:

> "The authorities consistently teach that although equitable relief against forfeiture will be afforded where a default in the payment of rent is due to fraud, mistake, surprise or accidents, courts of equity are divided on the question whether they should intercede where the breach is due to gross negligence, or is wilful and persistent, *but none*

*will grant relief against forfeiture where the tenant has violated fundamental principles of fair dealing. . . ."* [Emphasis added]

It will be noted that Judge McAuliffe also found that these appellants had violated fundamental principles of fair dealing. We are in accord with that finding from our review of the record and it follows without need of expression that we do not find him clearly erroneous in having so found. The prolonged non-compliance with the terms of the lease, the intentional destruction of records from which the statements and audits should have been made and the manipulation of books and records to reflect less gross income than was actually received — all of which the judge found as facts — certainly "violated fundamental principles of fair dealing." The precision of articulation and reasoning in the judge's written opinion made it clear that the evidence was weighed on a *Dreisonstok* scale. Such careful consideration, in light of the proper tests applied by him as to waiver, as well as equitable relief, left little for us to do but determine whether the evidence was sufficient to sustain his factual findings. We find that to be the case. None of his findings of fact were "clearly erroneous." Md. Rule 1086.

*Judgment affirmed.*
*Costs to be paid by appellants.*